One thing I would ask each of you to address at some point in your arguments is the significance of the Attorney General's ruling back at the end of July that redefined what a particular social group is and how that affects families. There has not been any briefing on that, no notification of that through a 28-J letter which you may be able to explain why that is. Go ahead. Thank you. Good morning, your honors. May it please the court, my name is Rebecca Cheff and I am here today on behalf of the appellants, Marisela Morales Lopez and her six-year-old daughter. By statute, an asylum applicant may demonstrate eligibility via two paths, past persecution or a well-founded fear of future persecution. Here, Ms. Morales was denied full and fair consideration of her eligibility via either path because of the clear legal errors committed below. In the words of this court, when the agency has failed to comply with its responsibilities, this court should insist on compliance rather than attempting to supplement its efforts. Now, remand is warranted here on several grounds and we have set out in our briefs the multiple legal errors committed by the agency, but today I'd like to focus on two of the most prominent errors in the well-founded fear analysis. First, circuit precedent prohibits importing the past persecution analysis into the well-founded fear analysis and to do so amounts to reversible error. Second, in reviewing asylum eligibility based on a well-founded fear, the agency must use the Moghrabi factors to determine whether Ms. Morales is likely to be singled out for persecution. Here, the agency failed to adhere to these binding legal frameworks and interwoven with the legal errors here is recurring procedural error. Throughout its analysis, the immigration judge disregarded key facts in the record and inserted its own speculative views instead. So, for example, the immigration judge determined that the threats issued to Ms. Morales were vague. But as Ms. Morales testified, the man who killed her husband, Jose Carlos, called her and said Jose Carlos hadn't been killed because he still had his wife and daughter alive. He said that everything that had to do with this dog would disappear. And Ms. Morales explicitly testified, he told me that they would kill me. And that's on page 386 of the record. This was a direct and explicit death threat. There was nothing vague about it. And in addition, the immigration judge cherry-picked portions of the expert's testimony to conclude that the Vatos Locos violence was gratuitous and unpredictable. But Professor Unger's actual testimony was that although the violence may seem unpredictable, there's actually a structure to these criminal groups. And he testified that in his estimation, Ms. Morales faces a 75 to 80 percent likelihood of being harmed or killed if she is returned because one of the well-known practices of these criminal groups is the persistent targeting of specific individuals, couples, and families. Also, an awful lot of your briefing as well as your argument so far is focusing on the fact-finding ultimately by the BIA to the extent they adopted the IJ, that as well. But as you know better than I, Felicity, with this case law that you would have, we must uphold that fact-finding unless the opposite result is compelled by the facts that are before us. And I forget the phrasing our courts sometimes used and how much articulation of that fact-finding is required, but it's not exhaustive. So what do you do with that standard? You have some very legitimate arguments of other ways to look at these facts. Very compelling, too strong a word maybe, but very sympathetic facts. But what about the insistence that we must have that there's only one result allowed by these facts? I'm not quite hearing that strong of an explanation. Now, if you disagree with the test, tell me I got it wrong. But otherwise, proceed with why we are compelled to reach the opposite result. I appreciate the question, Judge Southwick. And here, I would make two points. First, what's required here by the agency, by any reviewing body, is an accurate consideration of the record. And as we've addressed in our briefs and as we're discussing today, here, the immigration judge fundamentally twisted the expert testimony, overlooked some of the most important facts in the record, and inserted his own speculation, most notably about why Ms. Morales' son was approached at the school. He speculated that it was recruitment efforts on the part of the Vatos Locos when, in fact, testified that the Vatos Locos sought out her son to get information to locate her. And so fundamentally, before we get to a review of whether there's substantial evidence in the record, we need an accurate consideration of what was put forth, the proof that she presented to demonstrate her eligibility. And here, both for the well-founded fear analysis and the past persecution analysis, it is our position that what's required here is a de novo review of the legal errors that the immigration judge fundamentally failed to apply the correct legal frameworks. And so it's that adequate review that we're seeking here, which we believe comes first before we can get into the question of whether substantial evidence shows that she made that claim. First, the immigration judge, the agency, must apply the correct legal frameworks. And so here, you know, among the examples that we have of the baseless speculation that the immigration judge engaged in, as I mentioned, is the recruitment by the speculation by the immigration judge that there were recruitment efforts. And here, fundamentally, when we have indications in the record, as this court recognized in Abdel Nasir that the agency strayed from the correct legal frameworks, we need to get back to the basics of what's actually in the record. And I would note here that the government does not marshal much of an argument of the above. In fact, much of the government's brief addresses issues that are not even before this court. And the parts that are on point are almost fully devoid of legal citation and rather merely reiterate the decisions below, echoing some of the same errors that the agency committed. And so I'd like to turn to discussing in some more detail the most egregious errors that we believe were committed in the well-founded fear analysis. And as I mentioned, it is reversible error under the INA and this court's precedent to import the past persecution analysis into the immigration judge's consideration of an asylum applicant's fear of future persecution. As Cabrera holds, remand is warranted on this ground alone. Well-founded fear is a separate, distinct path to establish eligibility. And conflating the two, as the immigration judge did here, risks collapsing the well-founded fear inquiry into a residual or redundant analysis. As this court recognized in Abdel Nasir, past persecution does not necessarily set the outer bounds of the harm that may reasonably be expected in the future. Can past persecution ever be used, the facts, facts of past persecution ever be used or cited or in any way referenced in making an evaluation with regard to the well-founded fear? It seems like they're connected, at least chronologically, they're connected in terms of the nature of the persecution. Is that not fair? That's correct, Your Honor. And in fact, that's exactly what we're seeking here and what was lacking in the agency's analysis below. So in the past persecution analysis, here the immigration judge picked out four incidents of harm that Ms. Morales had suffered personally and considered those in isolation, which we say he should have considered more than the four that were considered, that were identified and considered for past persecution. Yes, Your Honor. It wasn't an error for him to consider the four, he just should have gone and considered other matters. That's correct. And when the agency turned to the well-founded fear analysis, if the agency had applied the matter of Moghrabi factors, there the agency should have and failed to look at the totality of the record, including the same facts that were analyzed under past persecution. So what I want to hear, I'm sorry. I was going to say, is this the first time that you have raised the Moghrabi case as an assignment of error, at least before this court? I guess I'm asking about jurisdiction, whether this has been raised before the case got here. I believe it has, Your Honor. I don't have the record site at my fingertips, but I'd be glad to provide it for you on rebuttal. So in connection with the Moghrabi factors, what I want to hear is, tell me what the factors are and then tell me what the BIA did wrong in connection with those factors. I'd be glad to, Judge Graves. One by one. For the Moghrabi factors, which are meant to ensure compliance with the reasonable possibility standard for well-founded fear, there's four factors. The first is whether the asylum applicant has a characteristic or a belief that the persecutors seek to overcome. So here for Ms. Morales, that's her status as the wife of Jose Carlos, who was tortured and killed. The second factor is whether the persecutors are aware of that characteristic or could become aware. And there's no doubt in the record here that the Vatos Locos were aware of her status as his wife. The third and fourth factors are the crux of the inquiry. It's whether the persecutors are capable of punishing that person for those characteristics or beliefs, and whether they're inclined to do so. And so for those third and fourth factors, that's where the heart of our concerns lie, that the immigration judge completely set aside any inquiry in the well-founded fear context of the harm and threats that were directed to Ms. Morales personally, and only looked at the harm and threats to other family members to determine if her fear was objectively reasonable. If the immigration judge had wrapped in the consideration of the harm that she had suffered personally and had taken an accurate view of the totality of the record, that would be the context-based comprehensive analysis that this Court mandates in Edouard, and that would be in keeping with the Mo Gravi factors. That's what's missing. So are you talking about the third factor or the fourth? Yes, the third and fourth, the persecutors. So the third is whether or not the persecutors are capable. Yes, Your Honor. What does that mean, capable? Whether they have the capacity to do it, the will to do it, what does that mean? Yes, the capacity, the means, the methods, the ability to do so. And here on this record, there's no room for doubt that they possessed the capacity to do so. These persecutors here, the Vatos Locos, not only had the personal phone number of Ms. Morales because they had her husband's cell phone and repeatedly called her on it, they knew where she lived, they knew how to find her, they knew how to find her children. They approached her in the street as she was leaving her mother-in-law's house and surrounded her. There's no doubt here that they had the means to track her down and issue threats to her and harm her. And so it's that capability and then their inclination to do so gets back to why her? Why her and not someone else? And they spoke very clearly to this. We have direct evidence in the record that they specifically expressed their motive. The head of the Vatos Locos called Ms. Morales and said, your husband is still alive so long as you and your daughter remain alive and we're going to kill you. And so that is as clear as it gets in terms of expressing the inclination to carry out. And I would recall here that the test as this circuit set out in Oriana Monson is whether a reasonable person in the same circumstances would fear persecution if they were returned to the country. And so here where we have expert testimony stating clearly that in the expert's experience based on the patterns that have already unfolded for Ms. Morales and her family, she faces 75 to 80 percent likelihood of being harmed. And the expert expressly said that given the sequence of events that's happened already, the next step for her would be attacks on her life, would be murder by the Vatos Locos. How does the expert arrive at that percentage? The expert arrived at that determination both through reviewing a declaration by Ms. Morales and speaking specifically to the sequencing in her case in the context of the expert's experience in country at the neighborhood level, at the level of working with police accountability and working with police reform to understand that this is a well-known practice that the Vatos Locos and other criminal organizations engage in of the targeting of family members in a way that persists and escalates over time. So in his experience, this is consistent with that pattern and something that the family that Ms. Morales could reasonably expect going forward. And I would note, I would like to address the court's question about Madereveillé. As this court knows, the attorney general's opinion in Madereveillé was issued well after briefing in this court was completed. And so this court has not yet had the opportunity to hear from either party about the potential applicability of Madereveillé in this case or whether the attorney general's opinion warrants deference by this court. Now, it's our position that, consistent with the recent decision by Judge Engelhardt in the Peña-Oseguera case, that remand would be appropriate to afford the parties an opportunity to provide supplemental briefing in light of Madereveillé and to supplement the record as necessary in light of this decision. I would make a few— Let me stop you there. The First Circuit last week, the day before Halloween, as you may remember it, October 30, actually said because Madereveillé was not briefed, no notice was given to the court of First Circuit, they didn't apply it. They applied the law as existed in the briefing and decided by the BAA, but still was necessary to remand. I don't know if you could bar the BIA from considering current law on remand. Is this any sense that because it's not yet been raised, it cannot be injected into this case at this stage? That may be. And even if we were to assume that it applies to this case, I would point out that Madereveillé was, in fact, a narrow holding, and it primarily served to reinforce that the inquiry into the cognizability of a particular social group must be fact-intensive and case-specific. That exact individual review is what's already— It's still an open, factual issue. It's not foreclosed. Well, your time is up. Thank you. You have time for rebuttal. Your Honor, may it please the Court. I'd like to begin by addressing the Madereveillé issue as well, given that opposing counsel just raised that. As counsel did say, it is a fact-intensive inquiry. What Madereveillé did is essentially set out a framework by which IJs and BIA can evaluate those standards. In this case, this Court can affirm without reaching that issue. And as opposing counsel agrees, if this Court were to choose to not affirm based on substantial evidence, based on the fact that the IJ and BIA did not err, the proper remedy would be remand in the first instance. And in that scenario, Madereveillé could be applied because the case would essentially be still on direct appeal. And Madereveillé itself is retroactive. You're probably not familiar. I just saw this morning a First Circuit case. I didn't understand its reasoning, but it basically said it would not apply because it had not yet been raised. I haven't read that First Circuit opinion, Your Honor, but I'm happy to submit a letter to the Court afterwards analyzing that First Circuit opinion and why they did that. Well, we'll let the parties know if we want anything supplemental on this. Of course, Your Honor. Addressing the two arguments that counsel focused on, first being that the IJ supposedly conflated past persecution analysis with the analysis of whether there's a well-founded fear of future persecution, respectfully, that's not what the IJ was doing. The IJ was explaining within the future persecution analysis that the same flaws that led him to conclude that there was no past persecution regarding those specific death threats apply in the future persecution analysis as well. If you look on record page 114, quoting from the IJ, as previously explained, the threats Ms. Morales personally received were too vague to qualify as past persecution. Similarly, descriptions of the instance involving other members of Jose Carlos's family lack detail. He was just analogizing to his prior analysis from the prior section. He wasn't improperly saying that because there was no past persecution, there cannot be a well-founded fear of future persecution. And second, counsel discussed the alleged failure to apply the Mogarabi factors. There was no actual legal error here. While the IJ did not cite the Mogarabi factors, the IJ did explicitly find that they were not met here. For example, the IJ's conclusion is that the evidence is not supportive finding, but the Vatos Locos seek to persecute the petitioner on account of a family relationship. That is the fourth Mogarabi factor, which is, I'm quoting here, the persecutor has the inclination to punish him. Moreover, Mogarabi itself instructs that testimony must be, quote, sufficiently detailed to provide a plausible and coherent account of the basis for the alien's fear. Here, the IJ actually said that the incidents in petitioner's testimony were not a plausible basis for her fear. So regardless of the fact that he did not actually recite or cite the actual opinion, he was applying the Mogarabi factors. What I expect happened here is that the actual litany of the Mogarabi factors is a little awkward to track onto a case like this. To take an example, the first Mogarabi factor is, quote, however the asylum seeker possesses a belief or characteristic a persecutor seeks to overcome by means of punishment. Being related to someone, family, is generally not a characteristic a persecutor is trying to overcome. Now obviously these factors do apply here, but that's why this type of language is very important. For example, petitioner herself cites this court's own opinion, Tamara Gomez, as an example of a situation where this court found there was a well-founded fear of future persecution. In that case, the Fifth Circuit never recited those four factors either. What's clear here, however, is that the IJ did in fact apply the Mogarabi factors. One other thing that I would like to address is that there is one point of error that the petitioner has raised that we agree that if the IJ had done would be a legal error. So I want to just make sure that the court is clear on that one. And that is the argument that the IJ imposed a higher burden of proof on the asylum seeker. Now it appears that the petitioner thinks the IJ required her to demonstrate she had a preponderance of the evidence fear that she would suffer future persecution, but that's not what the IJ was doing. Rather, the IJ was simply identifying that the petitioner's evidentiary burden was. In this case, preponderance of the evidence. He wasn't speaking to the quantum of likelihood that she had to demonstrate that she would be harmed. And it is in fact an applicant's burden to establish her overall eligibility of asylum by preponderance of the evidence. We addressed this in our brief and the petitioner did not address it again. The reply, it could be that they agree that that was just a misreading of the IJ opinion, but I wanted to make sure that this court was aware because that would be a legal error. Is there anything in the BIA opinion, I mean, you do start by adopting or agreeing with the IJ. Is there anything in BIA opinion that also removes the argument? Did the BIA? On the preponderance of the evidence point, Your Honor? Right. No, I mean, the BIA opinion just cites the standard correctly that the asylum seeker has the burden to prove by preponderance of the evidence, but does not talk about that in the context of how much fear she needs to have. Everyone agrees that and it appears that the BIA did not even think that was an issue. In fact, if I recall correctly, in the briefing before the BIA, that issue about an incorrect standard of proof was not raised. I'll defer to opposing counsel on that. In addition, the petitioner, the rest of the petitioner's arguments, generally speaking, fall under a dispute over the factual characterization, whether it's, you know, for example, the petitioner thinks the IJ required her to demonstrate direct proof of motives. But again, the IJ did not do that. Instead, what he required was sufficient proof, direct or indirect. It wasn't a requirement of direct proof, but the incidents in question were persecution targeted towards individuals and their family. And he found the testimony was too vague and uncertain to do that. That is his factual conclusion. In addition, the petitioner claimed, and raised that a little bit during our amendment, that the IJ did not consider all the incidents in the aggregate, but instead analyzed each one and dismissed each one individually when an IJ is, in fact, required to consider the incidents in the aggregate. But again, that's not what happened. The board explicitly said that it was considering, quote, the entirety of the record in the aggregate. And the IJ's own conclusions regarding past persecution repeatedly refer to the incidents in the plural, quote, the threats she received. The IJ was considering all the incidents. While it's true that the IJ analyzed each individual incident as well, that's what he's supposed to do. It showed the IJ was not painting with a broad brush. He was analyzing each incident, determining what the petitioner was, beliefs and fears were during that, and then determine in the aggregate that it did not satisfy her burden of establishing past persecution. I guess I've been sitting here thinking from when you said that the IJ found that testimony was too vague. I understood when you said that a threat was too vague. But testimony is too vague? I misspoke, Your Honor. I meant that the testimony was clear, but that even assuming what the petitioner was saying was true, those threats themselves were too vague to consecute past persecution. All right. Sorry. I misspoke, Your Honor. I was trying to catch up. I said testimony was too vague? What would that mean? I apologize, Your Honor. All right. If there are no further questions, Your Honor, I'm happy to yield back my time. All right, counsel. You don't need to rush. That may have been an unexpected ending. May it please the court. My remaining time, I would like to briefly address a few of the points made by counsel for the government, and then to make a final point about the role of this court in reviewing legal errors of this sort as committed by the agency. Now, initially, I would note that the counsel for the government discussed the evidentiary burden for the petitioner, and as we say clearly in our reply brief, we are not disputing that the burden on the applicant is to show by a preponderance their eligibility for asylum. When it comes to the well-founded fear analysis, what the applicant is required to show is that they face a reasonable possibility of harm if they are returned to their home country, and that standard, as recognized in Cardozo-Fonseca, may be met by a showing of as little as 10% likelihood of harm. As this court recognized in Adelmecia and Orellana-Monson, this inquiry is a reasonableness one. It's whether a reasonable person in the applicant's circumstances would fear return. And in terms of what the immigration judge said about this, in the immigration judge's reasoning on well-founded fear, the only case that it cited about this standard was Juh versus Ashcroft, which sets out the withholding standard, a 51% standard, which is not the correct standard to be applied here. And so it's our position that in the context of the legal errors committed by the agency and that citation to the incorrect standard, it's simply not clear on this record that the agency applied the correct standard here. Now, counsel for the government stated that the board did, in fact, consider incidents in their totality and that the immigration judge was merely picking out particular incidents to highlight for discussion. But here, we know from the record that the immigration judge, looking at well-founded fear, completely set aside the most serious forms of harm and suffering that Ms. Morales was subjected to. Because the immigration judge did not comply with the Moghrabi analysis, the immigration judge did not consider the import of the recording that was sent to Ms. Morales of her husband's cell phone on the day of his funeral. The Vatos Locos did not make that recording for any purpose other than to intimidate Ms. Morales, and they put that recording to its intended use days after they torture her husband to death. That consideration did not make its way into the immigration judge's reasoning on well-founded fear. And as I mentioned, the immigration judge inappropriately concluded that the threat made to Ms. Morales by the head of the Vatos Locos was vague when her testimony, which was credited and must be taken as true, demonstrated that she received an explicit death threat by phone from the head of the Vatos Locos. If we're talking about direct evidence of the reasonableness of her fear or the motive for her targeting, it doesn't get much clearer than that. And here, where we have evidence that, where we have indications that the agency strayed from the correct legal frameworks, the agency, as this court recognized in Abdel Nassir, has the burden to demonstrate, or is required to demonstrate, that has provided meaningful consideration of each piece of substantial relevant evidence in the record. What we're not asking for here is we're not asking for the agency to delve into the minutiae of cataloging out each piece of evidence that's been presented. But whereas here we have gaping holes in the analysis and some of the most important facts have not been considered or have been misconstrued, that is cause for concern. And as counsel for the government stated, I would like to address the counsel for the government stated that the immigration judge implicitly applied the Mogherabi factors here. We have no evidence on this record of that implicit consideration. The immigration judge dismissed in one sentence any notion that Ms. Morales's threats and harm that she personally suffered were relevant for the well-founded fear inquiry. And the matter of Mogherabi inquiry demands more. The immigration judge also gave very light treatment to the fact that Ms. Morales was forced to go into hiding and to put her children into hiding as a result of the threats that she and other family members had received. And we know in this court's analysis in the Zao versus Gonzalez case that going into hiding is not the end of persecution. Being forced into hiding does not mean that the persecutors are no longer pursuing the applicant or that the threat has passed. In fact, here we have clear expert testimony that the threats of this nature tend to coalesce back into place because family ties are immutable and the Vatos Locos have a long memory. And here in their eyes they have unfinished business with Ms. Morales because of her status as Jose Carlos's wife. So here we would ask that this court remand with instructions for the board to apply the required legal frameworks. Thank you. All right. Thank you counsel for bringing this case to us. We'll take it under advisement.